IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Stephanie N.,[1] | ) | C/A No.: 1:20-2027-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Andrew M. Saul, | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable Cameron McGowan Currie, United States District Judge, dated June 9, 2020, referring this matter for disposition. [ECF No. 5]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 4].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB"). The two issues before the court are

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the court reverses and remands the Commissioner's decision for further proceedings as set forth herein.

I.    Relevant Background

   A.    Procedural History

On March 2, 2017, Plaintiff protectively filed an application for DIB in which she alleged her disability began on September 27, 2016. Tr. at 409–12. Her application was denied initially and upon reconsideration. Tr. at 358–61, 363–67. On October 30, 2018, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Joshua Vineyard. Tr. at 41–131 (Hr'g Tr.). The ALJ issued an unfavorable decision on March 20, 2019, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 14–40. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 6–11. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on May 28, 2020. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 45 years old at the time of the hearing. Tr. at 62. She obtained an associate degree. Tr. at 64. Her past relevant work ("PRW") was as a legal assistant and paralegal. Tr. at 63. She alleges she has been unable to work since September 27, 2016. Tr. at 61.

2.    Medical History[2]

Plaintiff presented to psychiatrist Mary S. Boyd, M.D. ("Dr. Boyd"), for an initial psychiatric evaluation on June 5, 2012. Tr. at 591–92. She complained of a lack of attention and inability to concentrate. Tr. at 591. She indicated her primary care physician had prescribed Strattera. *Id.* She stated the medication was effective, but she was unable to tolerate it because of upset stomach. *Id.* She endorsed a history of depression characterized by hopelessness, helplessness, worthlessness, fatigue, depressed mood, anhedonia, and suicidal ideation, but noted her symptoms were well-maintained on Wellbutrin. *Id.* She also reported a history of post-traumatic stress disorder ("PTSD") due to childhood trauma that was associated with flashbacks, nightmares, hyperarousal, and avoidance of certain social

---

[2] The undersigned has reviewed all evidence and summarized the treatment notes that appeared in the record before the ALJ. Plaintiff submitted additional evidence to the Appeals Council. Tr. at 132–304. The undersigned declines to summarize the additional medical records, as Plaintiff does not allege the Appeals Council erred in reviewing them.

situations. *Id.* She indicated she had been hospitalized twice in her late teens for suicidal ideation. *Id.* Dr. Boyd recorded normal findings on mental status exam ("MSE"). Tr. at 592. She assessed PTSD, attention deficit hyperactivity disorder ("ADHD"), and depression, not otherwise specified ("NOS"). *Id.* She prescribed Adderall XR 10 mg, continued Wellbutrin XL 300 mg, referred Plaintiff for supportive therapy, and recommended Melatonin 5 mg for sleep. *Id.*

Dr. Boyd increased Plaintiff's Adderall XR dose to 40 mg daily on July 10, 2012, after she reported the 10 mg and 20 mg doses were ineffective. Tr. at 593.

On February 26, 2013, Dr. Boyd initiated a trial of Cymbalta 30 mg and increased Adderall XR to 60 mg based on Plaintiff's report that she was "feeling a little down" and had increased anxiety, poor concentration, fatigue, and difficulty sleeping. Tr. at 595.

On March 26, 2013, Plaintiff reported she had not started Cymbalta because she had not met her insurance deductible and the cost was too high. Tr. at 596. She endorsed improved symptoms on the increased dose of Adderall. *Id.*

On September 3, 2013, Plaintiff reported she had started Cymbalta and was doing well. Tr. at 597. Dr. Boyd continued Cymbalta 30 mg daily,

Wellbutrin XL 300 mg daily, Adderall 60 mg daily, and Xanax 0.5 mg daily, as needed. *Id.*

Plaintiff complained of sleep disturbance on January 24, 2014. Tr. at 598. She described waking four or five times during the night and endorsed low energy and difficulty concentrating throughout the day. *Id.* Dr. Boyd prescribed Trazodone 50 mg for sleep. *Id.*

On April 23, 2014, Plaintiff reported she had stopped taking Cymbalta because she could not afford it and had discontinued Trazodone because it was no more effective than Advil PM. Tr. at 599. She indicated Wellbutrin and Adderall were adequately controlling her symptoms. *Id.* Dr. Boyd continued Plaintiff's prescriptions. *Id.*

On October 6, 2014, Plaintiff reported doing well over the prior six months and indicated her medications continued to work well for her. Tr. at 600. Dr. Boyd noted normal findings on MSE. *Id.* She continued Plaintiff's prescriptions. *Id.*

On October 9, 2014, Devin Troyer, M.D. ("Dr. Troyer"), administered electromyography ("EMG") and nerve conduction studies ("NCS") that showed slowing of the median motor and sensory nerves at the right wrist segment most consistent with carpal tunnel syndrome ("CTS"). Tr. at 540–41. It indicated no evidence of other nerve impingement, peripheral neuropathy, or radiculopathy. *Id.*

Plaintiff followed up with David K. Lee, M.D. ("Dr. Lee"), to discuss results of magnetic resonance imaging ("MRI") of her right elbow on January 29, 2015. Tr. at 542. She endorsed small finger spasms. *Id.* Dr. Lee noted tenderness along the cubital tunnel, positive Tinel's and Phalen's signs, and positive median nerve compression test on physical exam. *Id.* He observed full range of motion ("ROM") of Plaintiff's right wrist and elbow. *Id.* He stated the MRI of Plaintiff's elbow was negative for any soft tissue pathology. *Id.* He indicated Plaintiff planned to proceed with right carpal tunnel release and ulnar nerve transposition. *Id.*

On March 2, 2015, Plaintiff reported stable psychiatric symptoms and no issues with her medications. Tr. at 601. Dr. Boyd recorded normal findings on MSE. *Id.* She refilled Wellbutrin XL 300 mg daily, Adderall XR 60 mg daily, and Xanax 0.5 mg daily, as needed. *Id.*

Dr. Lee performed right carpal tunnel release and ulnar nerve transposition on March 23, 2015. Tr. at 549–53.

Plaintiff returned to Dr. Lee for post-surgical follow up on April 7, 2015. Tr. at 554. She reported doing well. *Id.* Dr. Lee observed well-healed incisions along Plaintiff's wrist and elbow and improved swelling along the ulnar border. *Id.* A neurovascular exam was normal. *Id.* Dr. Lee refilled Hydrocodone-Acetaminophen 7.5-325 mg for pain, removed sutures and staples, placed Plaintiff in a Velcro wrist splint, and referred her for

occupational therapy. *Id.* He indicated Plaintiff should remain out of work for two additional weeks prior to returning to work on light duty with limited use of the right arm. Tr. at 555.

On May 5, 2015, Plaintiff reported she had been participating in physical therapy for two weeks and was receiving some benefit. Tr. at 557. Dr. Lee noted well-healed incisions and a normal neurovascular exam. *Id.* He instructed Plaintiff to continue with therapy and refilled Hydrocodone-Acetaminophen. *Id.* He noted Plaintiff was able to resume light duty work requiring "NO PUSHING/PULLING more than 5 lbs" and "NO LIFTING MORE THAN 5 POUNDS." Tr. at 559.

Plaintiff complained of constant pain in her whole arm on June 2, 2015. Tr. at 560. Dr. Lee observed well-healed incisions at the right wrist and elbow and symmetric exam, but some generalized weakness. *Id.* He refilled Hydrocodone-Acetaminophen and noted Plaintiff needed to be "a little more aggressive" with strengthening. *Id.* He continued therapy and instructed Plaintiff to work on strengthening and work conditioning. *Id.* He provided restrictions for "NO PUSHING/PULLING" AND "NO LIFTING MORE THAN 5 POUNDS." Tr. at 561.

Plaintiff participated in physical therapy at Vital Energy, LLC, in June 2015. Tr. at 845–52.

On July 16, 2015, Plaintiff reported that her workers' compensation insurer had discontinued her therapy. Tr. at 563. Dr. Lee noted well-healed incisions, no instability, and normal neurovascular exam. *Id.* He continued Hydrocodone-Acetaminophen and requested authorization for Plaintiff to attend physical/occupational therapy at a new venue. *Id.* He continued the same restrictions. Tr. at 564.

Plaintiff complained of irritability and a lot of pain in her arm on August 4, 2015. Tr. at 602. Dr. Boyd encouraged Plaintiff to discontinue Hydrocodone, as it was contributing to her mood symptoms. *Id.* She noted Plaintiff was sleepy and had an irritable mood, but recorded otherwise normal findings on MSE. *Id.* She increased Xanax 0.5 mg to twice a day. *Id.*

On August 13, 2015, Plaintiff reported no change from her last visit. Tr. at 565. She indicated she had attended one week of physical therapy with the new provider and had noticed improvement. *Id.* She complained of a nodule on her right hand and pain, numbness, and tingling in her left hand. *Id.* Dr. Lee noted "the early parts of a Dupuytren's contracture to the long finger" of the right hand. *Id.* He observed full ROM and positive Tinel's and Phalen's signs and median nerve compression test on the left. *Id.* He instructed Plaintiff to continue physical therapy for her right upper extremity ("RUE") and requested authorization for bilateral EMG and NCS. *Id.* Dr. Lee continued the same restrictions. Tr. at 566.

Plaintiff participated in physical therapy at Carolina Physical Therapy in August and September 2015. Tr. at 825–31.

Plaintiff complained of worsened RUE pain on September 10, 2015. Tr. at 567. Dr. Lee noted passively reducible flexion of the right small finger and some tenderness along the carpal tunnel bilaterally. *Id.* He renewed Hydrocodone-Acetaminophen for pain and recommended EMG and NCS of the bilateral upper extremities and referral to a neurologist. *Id.* He continued the same restrictions. Tr. at 568.

Plaintiff presented to physical medicine and rehabilitation specialist W. Daniel Westerkam, M.D. ("Dr. Westerkam"), for evaluation of right arm pain on September 24, 2015. Tr. at 572–73. She described significant cold intolerance, trouble gripping, a wet sensation on the back of her arm, burning in her middle finger, swelling, pain along the incision on her elbow, numbness at night, dropping things, and throbbing pain at the thumb, hand, and wrist. Tr. at 572. She also endorsed a new onset of symptoms in her left hand. *Id.* Dr. Westerkam noted some tenderness over Plaintiff's surgical scars, tenderness to palpation in the forearm, swelling around the elbow, and diffuse weakness in the right arm. *Id.* EMG and NCS were normal on the left and right. Tr. at 573. Dr. Westerkam noted the median nerve appeared to be improved from the prior study. *Id.* He indicated Plaintiff's persistent pain, swelling and cold sensitivity" suggested she might be developing complex

regional pain syndrome ("CRPS") or reflex sympathetic dystrophy syndrome ("RSDS"). *Id.*

Plaintiff presented to neurologist Jessica Floyd, M.D. ("Dr. Floyd"), for evaluation of upper extremity pain on October 29, 2015. Tr. at 575. She described burning, itching, hyperpigmentation, swelling, erythema, and redness in her right arm and hand. *Id.* Dr. Floyd noted normal findings on MSE, 5/5 strength in the proximal and distal muscle groups of the bilateral upper and lower extremities, reduced reflexes in the right arm, normal reflexes elsewhere, normal coordination and gait, hyperpigmentation alternating with hypopigmentation on the right arm, hyperesthesia and dysesthesia in the right arm extending into the right hand in a patchy distribution, intact vibration, and normal sensation elsewhere. Tr. at 576. She assessed CRPS, type I, of the RUE and prescribed Gabapentin. Tr. at 577. She recommended regular physical therapy, neuropathic pain medications, acupuncture, massage therapy, optimizing sleep and nutrition, daily exercise, and cognitive behavioral therapy. Tr. at 587.

Plaintiff reported worsened anxiety on November 23, 2015. Tr. at 603. Dr. Boyd increased Xanax 0.5 mg to three times a day. *Id.*

On December 10, 2015, Plaintiff reported taking Gabapentin at bedtime and noted improvement to her quality of life, insomnia, energy level, and pain since discontinuing Hydrocodone. Tr. at 579. Dr. Floyd prescribed

vitamin D 50,000 units to address Plaintiff's low vitamin D level and ordered additional lab studies. Tr. at 581. She prescribed Gabapentin 300 mg and instructed Plaintiff to take three capsules at night. *Id.*

On January 20, 2016, Dr. Boyd noted Plaintiff's mental health issues were stable and manageable with medication prior to her February 2014 injury. Tr. at 604. She noted the aggravation of Plaintiff's mental health issues and increased anxiety were most probably causally related to her work accident and the increase in her daily anxiety medication was medically necessary and appropriate. Tr. at 604–05.

On February 22, 2016, Plaintiff endorsed mood swings and depression and complained that symptoms of CRPS were affecting her sleep. Tr. at 606. Dr. Boyd noted irritable mood, but otherwise normal findings on MSE. *Id.* She refilled Plaintiff's medications and prescribed Cymbalta 30 mg to be tapered up to 60 mg. *Id.*

On March 29, 2016, Plaintiff complained that Cymbalta worsened her arm pain and made her feel like a zombie. Tr. at 607. She continued to endorse mood swings, anxiety, and depression. *Id.* Dr. Boyd discontinued Cymbalta and prescribed Prozac. *Id.*

Plaintiff presented to neurologist Donald Schmechel, M.D. ("Dr. Schmechel"), for follow up as to right arm, shoulder, and neck pain on May 3, 2016. Tr. at 583. She rated her pain as a seven on a 10-point scale. *Id.* Dr.

Schmechel noted normal MSE, intact cranial nerves, normal muscle bulk and tone in the upper and lower extremities, 5/5 strength in the upper and lower extremities, reduced reflexes in the right arm, and normal reflexes in the triceps, biceps, brachioradialis, patellae, and Achilles bilaterally. Tr. at 584.

On May 11, 2016, Plaintiff reported Prozac had improved her symptoms and requested an increased dose. Tr. at 608. Dr. Boyd noted Plaintiff's mood was calmer. *Id.* She increased Prozac to 40 mg. *Id.*

Plaintiff reported being under significant stress on August 9, 2016. Tr. at 610. She endorsed stability on her current psychiatric medications and requested no change. *Id.* Dr. Boyd noted normal findings on MSE. *Id.* She refilled Plaintiff's medications. *Id.*

Plaintiff complained of headaches, ringing in her ears, and pain in her right palm and forearm on September 1, 2016. Tr. at 718. Dr. Schmechel noted the following abnormal findings on exam: reduced reflexes in the right arm; hyperpigmentation alternating with hypopigmentation in the right arm; hyperesthesia and dysesthesia in the right arm extending into the right hand; decreased ability to concentrate; diminished sensation to light touch in the bilateral arms and hands and right leg; diminished sensation to pinprick in the bilateral arms, hands, and legs; impaired proprioception at the fingers in both arms and the toes in both legs; impaired balance; positive Romberg's sign; reduced biceps reflexes, brachioradialis, and ankle jerk on the right;

reduced triceps reflexes on the left; absent Babinski reflex, ankle clonus, and primitive reflexes bilaterally; flattened lumbar posture; abnormal jaw jerk; and moderate antalgic gait. Tr. at 720–22. He recommended chronic pain management and hemochromatosis gene testing. Tr. at 724.

Screening conducted on September 1, 2016, showed Plaintiff to be homozygous for the HFE C282Y genetic mutation, placing her at high risk for hereditary hemochromatosis. Tr. at 649–50. The results indicated Plaintiff had a disorder of iron metabolism that caused excess iron storage and could lead to increased skin pigmentation, arthritis, hypogonadism, diabetes mellitus, heart arrhythmias/failure, cirrhosis, and liver carcinoma. Tr. at 650.

On September 27, 2016, Plaintiff reported her employer had terminated her. Tr. at 612. She indicated her job had been overwhelming and had caused increased stress and anxiety. *Id.* Dr. Boyd noted anxious and sad mood/affect and otherwise normal findings on MSE. *Id.* She completed short-term disability insurance paperwork in which she identified Plaintiff's primary diagnosis as PTSD and her secondary diagnosis as major depressive disorder ("MDD"), recurrent and severe. Tr. at 570. She indicated she treated Plaintiff with ongoing medication management and adjustment, as necessary. *Id.* She stated Plaintiff's medications included Xanax 0.5 mg three times a day, Wellbutrin XL 300 mg, Adderall XR 60 mg, and Prozac 40 mg. *Id.* She wrote: "pt, due to severe anxiety, panic symptoms, depression,

concentration difficulties and mood swings, is unable to currently fulfill her current job obligation." Tr. at 571. She further wrote: "As of 8/14/15, her symptoms have exacerbated/worsened and she is unable to work due to the above diagnoses/symptoms." *Id.*

Plaintiff returned to Dr. Boyd on October 7, 2016, after having run out of Prozac. Tr. at 613. She reported she was not working and continued to have right arm pain due to CRPS. *Id.* Dr. Boyd noted tearful mood/affect, but otherwise normal findings on MSE. *Id.* She refilled Plaintiff's medications. *Id.*

Plaintiff presented to neurologist Marshall A. White, M.D. ("Dr. White"), for an independent medical evaluation on October 12, 2016. Tr. at 620–22. Dr. White reviewed Plaintiff's injury and treatment history. Tr. at 620–21. Plaintiff reported constant numbness in her elbow and arm and pain that progressively worsened throughout the day and workweek. Tr. at 621. She endorsed difficulty pulling file drawers, removing files from drawers, writing, standing for long periods without holding her right arm, concentrating, keeping up with her workload, and performing personal care and many activities of daily living ("ADLs"). *Id.* Dr. White noted the following observations on exam: alert and oriented; normal cognition; normal speech; grossly intact cranial nerves; diffuse weakness in all muscle groups tested in the RUE; some slight bilateral tremulousness of the hands; slightly suppressed biceps tendon reflex on the right; negative Romberg testing; no

14

appendicular or axial cerebellar abnormalities; tenderness with compression of the hand; no sensory allodynia to light touch; no hyperhidrosis on the right side compared to the left; slight moistness of both hands to the same degree; no mottling of the skin; no temperature difference from side to side; flexion contracture of the right fifth digit; and subjective numbness along the ulna, closer to the elbow, in the more proximal portion, and in the antecubital fossa and on the extensor surface of the arm. *Id.* He acknowledged Drs. Floyd's and Schmechel's impressions of CRPS, but indicated neither physician's notes reflected "examination of the pertinent findings to substantiate this diagnosis." Tr. at 621–22. Dr. White wrote the following:

> It is my opinion, to a reasonable degree of medical certainty, that the only diagnosis that has been medically proven is the diagnosis of carpal tunnel syndrome. This diagnosis cannot, to a reasonable degree of medical certainty, be related to her striking her mid-radial forearm on a door knob. Furthermore, she has been convinced that she has complex regional pain syndrome. I have reviewed the [International Association for the Study of Pain] diagnostic criteria for complex regional pain syndrome, along with the Budapest Criteria and, fortunately for Ms. Newman, she does not meet either criteria for the diagnosis of complex regional pain syndrome. Furthermore, I can find no documentation of appropriate physical examination to allow any physician that has examined her to assess her accurately for meeting criteria of complex regional pain syndrome. At this point in time, after examining her and reviewing the entire chart, I can find no basis in examination or fact to support a diagnosis of complex regional pain syndrome. It is also important to note that her symptoms and the diagnosis of complex regional pain syndrome was suggested after she had the two surgeries in the upper extremity. It remains unclear to me why an ulnar transposition was performed. Based on my medical practice of neurology, it is unlikely, based upon the physical findings, after

15

my chart review, that I would have recommended ulnar nerve transposition. I would certainly agree that carpal tunnel release was a reasonable therapeutic intervention. Ms. Newman has a longstanding psychiatric history, with both depression and anxiety. Based upon the sheer volume and magnitude of her symptoms, I would be concerned about her chronic symptoms and subsequent loss of employment, leading to added levels of stress and that would clearly seem to be symptom magnification. Thus, it is my opinion, to a reasonable degree of medical certainty, that the only diagnosis that can be linked to her work-related injury is forearm contusion. This would not be expected to lead to additional injury or disability and should have been a self-limited disorder.

Tr. at 622.

Plaintiff presented to Charles Shissias, M.D. ("Dr. Shissias"), a physician with specializations in neurology and psychology, for an independent medical evaluation on December 15, 2016. Tr. at 623–24. She endorsed chronic RUE pain that followed a strike to her forearm in February 2014 and failed to improve with right carpal tunnel release and ulnar nerve transposition. Tr. at 623. She described coolness, swelling, reduced grip, cold intolerance, and throbbing, aching, and stabbing pain in her RUE. *Id.* Dr. Shissias noted mild contracture of the right fifth digit, good hand strength, comparative coolness to touch of the RUE, and visible discomfort to touch, even when Plaintiff was distracted. *Id.* He assessed paresthesia of skin, CRPS I of the right upper limb, and depression. Tr. at 624. He noted: "Pt with interesting presentation. Pt has had EMG/NCS suggestive of CTS—no finding suggestive of ulnar nerve lesion or cervical radiculopathy. I have

explained to pt CTS most likely due to repetitive movements rather than solitary strike to forearm." *Id.* He further noted MRIs of the cervical spine and right elbow and more recent EMG and NCS were negative. *Id.* He wrote the following:

> Feel the contracture of the [right fifth] digit is most likely disuse atrophy due to RSD rather than an ulnar nerve lesion. A NCS of the [right] ulnar nerve using an inching technique would likely confirm absence of an ulnar lesion if desired. I do not see any study prior to ulnar nerve transposition surgery that explains why this was offered. Believe that best explanation for [right] neck and [right] shoulder pain is due to fatigue from prolonged guarding of the RUE. Believe [left] hand complaints of 9/2015 are clinically irrelevant . . . . Believe the RSD complaints of the RUE and [right] hand are most likely due to the work-related accident of 2/17/14 and that treatment, neurology, or a pain management specialist is warranted.

*Id.* He prescribed Trileptal 300 mg twice a day. *Id.*

On January 30, 2017, Plaintiff complained of a lot of pain. Tr. at 640. She endorsed anxiety and frustration, but indicated no desire to adjust her medications. *Id.* Dr. Boyd noted normal findings on MSE. *Id.* She completed a second questionnaire as to the exacerbation of Plaintiff's mental health symptoms following the injury to her right arm. Tr. at 614–16.

On February 21, 2017, Plaintiff complained of headaches, right arm pain, and ringing in her right ear. Tr. at 708. She indicated Trileptal was not controlling her pain. *Id.* Dr. Schmechel noted abnormal findings that included: reduced reflexes in the right arm; hyperpigmentation alternating with hypopigmentation in the right arm; hyperesthesia and dysesthesia in

the right arm extending into the right hand; decreased ability to concentrate; diminished sensation to light touch in the bilateral arms and hands and right leg; diminished sensation to pinprick in the bilateral arms, hands, and legs; impaired proprioception at the fingers in both arms and the toes in both legs; impaired balance; positive Romberg's sign; reduced biceps reflexes, brachioradialis, and ankle jerk on the right; reduced triceps reflexes on the left; absent Babinski reflex, ankle clonus, and primitive reflexes bilaterally; flattened lumbar posture; abnormal jaw jerk; and moderate antalgic gait. Tr. at 710–12. He prescribed two Gabapentin 600 mg tablets at bedtime and referred Plaintiff to a pain management physician. Tr. at 713. He recommended serial phlebotomy for iron store reduction given Plaintiff's hemochromatosis. *Id.*

On April 4, 2017, Plaintiff presented to physician assistant Laura Ann Rate ("PA Rate") at Southeastern Orthopaedic and Sports Medicine, after having hyperextended her right knee when her dog ran in front of her. Tr. at 706. She complained of sharp pain to the medial side of her knee, swelling, and a feeling of instability. *Id.* PA Rate observed Plaintiff to walk with normal gait and indicated normal exam findings, aside from pain with increased flexion of the right knee and tenderness to palpation over the right medial collateral ligament ("MCL"). Tr. at 706–07. X-rays of Plaintiff's right knee showed no abnormalities. Tr. at 707. PA Rate assessed knee pain with

MCL Sprain and possible meniscal tear. *Id.* She placed Plaintiff in a hinged knee brace and prescribed Pennsaid 2% transdermal solution. *Id.*

Plaintiff reported she was "not good" on April 25, 2017. Tr. at 639. She complained of increased problems due to a torn meniscus. *Id.* She indicated she "stay[ed] in bed a lot." *Id.* Dr. Boyd noted depressed mood/affect. *Id.* She increased Prozac to 60 mg. *Id.*

On April 27, 2017, Plaintiff presented to the emergency room at Lexington Medical Center with complaints of abdominal cramping, bloating, and vomiting black material. Tr. at 683. A computed tomography ("CT") scan of Plaintiff's abdomen and pelvis showed hepatic steatosis and a small liver cyst. Tr. at 685. Alexander A. Remedios, M.D., assessed acute abdominal pain and acute hepatitis and instructed Plaintiff to follow up with a gastroenterologist. Tr. at 688.

Dr. Boyd completed a form addressing Plaintiff's mental diagnoses and status on May 16, 2017. Tr. at 701. She indicated she had last treated Plaintiff on April 25, 2017. *Id.* She identified Plaintiff's diagnoses as PTSD, ADHD, and MDD, recurrent and severe. *Id.* She noted Wellbutrin XL, Prozac, Xanax, and Adderall were being prescribed and had helped Plaintiff's condition. *Id.* She stated she was providing psychiatric care. *Id.* She described Plaintiff as oriented to time, person, place, and situation and having an intact thought process, appropriate thought content, depressed mood/affect, poor

attention/concentration, and adequate memory. *Id.* She indicated Plaintiff had good ability to complete basic ADLs; adequate ability to relate to others and complete simple, routine tasks; and poor ability to complete complex tasks. *Id.* She wrote: "Due to her poor concentration, she is unable to adequately complete complex tasks." *Id.* She also noted: "Her current ability to work is severely impacted by her depression at this time." *Id.* She considered Plaintiff capable of managing her funds. *Id.*

Plaintiff followed up as to her right knee on May 16, 2017. Tr. at 704. PA Rate observed that Plaintiff was not wearing her hinged knee brace, and Plaintiff indicated she wore it only when she expected to be standing for a prolonged period because it caused numbness in her leg. *Id.* PA Rate noted tenderness along the MCL, no laxity with varus or valgus stress, stable anterior cruciate ligament and posterior cruciate ligament, and negative McMurray test. *Id.* She advised Plaintiff to continue to use the knee brace and referred her to physical therapy. *Id.*

On June 28, 2017, state agency psychological consultant Blythe Farish-Ferrer, Ph.D. ("Dr. Farish-Ferrer"), reviewed the evidence and considered listings 12.04 for depressive, bipolar, and related disorders, 12.06 for anxiety and obsessive-compulsive disorders, and 12.11 for neurodevelopmental disorders. Tr. at 323–24. She rated Plaintiff as moderately limited in the following abilities: understand, remember, or apply information; interact

with others; concentrate, persist, or maintain pace; and adapt or manage oneself. *Id.* She completed a mental residual functional capacity ("RFC") assessment, assessing moderate difficulties as to abilities to: understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted by them; interact appropriately with the general public; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting. Tr. at 329–31. A second state agency psychological consultant, Marvin Blase, M.D. ("Dr. Blase"), reviewed the record, considered the same listings, and assessed the same degree of impairment as Dr. Farish-Ferrer. *Compare* Tr. at 323–24, with Tr. at 345–46. In completing a mental RFC assessment, he assessed moderate limitation in the same abilities as Dr. Farish-Ferrer, but also considered Plaintiff to be moderately limited in her abilities to accept instructions and respond appropriately to criticism from supervisors and to set realistic goals or make plans independently of others. *Compare* Tr. 329–31, *with* Tr. at 351–53.

On August 15, 2017, Plaintiff reported increased pain in her right knee after sustaining a fall from a bus while traveling with her daughter in New York City. Tr. at 735. PA Rate noted no significant swelling or effusion, but significant tenderness of the medial joint space and patella and pain with

increased flexion and McMurray's test. Tr. at 736. She assessed right knee pain with possible meniscal tear. *Id.* She prescribed Diclofenac and ordered an MRI of the right knee. *Id.*

Plaintiff follow up with PA Rate to discuss the MRI results on August 22, 2017. Tr. at 739. She described locking and catching in the right knee and pain mainly in the back and on the medial side of the knee. *Id.* She reported some improvement with Diclofenac. *Id.* PA Rate noted tenderness of the medial joint space and pain with increased flexion and McMurray's test. Tr. at 740. She indicated the MRI showed a radial tear of the posterior horn of the medial meniscus, as well as medial and lateral joint degenerative joint disease ("DJD"). *Id.* Plaintiff declined PA Rate's offer of an injection and opted to proceed with a surgical consultation. *Id.*

On August 29, 2017, Plaintiff reported doing much better following a medication change. Tr. at 786. She continued to endorse pain related to RSDS/CRPS, but indicated she was "dealing with it." *Id.* She noted she was stable on her psychiatric medications and requested no change. *Id.* Dr. Boyd noted normal findings on MSE and continued Plaintiff's medications. *Id.*

Plaintiff presented to Eric Schleuter, M.D. ("Dr. Schleuter"), for a consultative physical exam on September 16, 2017. Tr. at 728–32. She endorsed chronic pain in her right arm that was worsened by air movement, weather conditions, prolonged use of the arm and hand, and prolonged

standing, sitting, walking, pushing, and pulling. Tr. at 728. She said she experienced flare-ups that were characterized by a crushing pressure sensation. *Id.* She also reported weakness in her right arm and hand. *Id.* She noted she had been diagnosed with CRPS. *Id.* She stated her pain made her more emotional, tearful, anxious, moody, and forgetful and caused her to experience nightmares and difficulty concentrating. Tr. at 729. She reported a history of depression and PTSD. *Id.* She indicated she had right knee pain due to a torn meniscus. *Id.* Dr. Schleuter noted Plaintiff reported muscle wasting to the right shoulder, but he did not appreciate it on exam. Tr. at 730. He stated there were no skin changes or physical deformity to any part of the right extremity. *Id.* He observed normal findings, aside from mild reduced dexterity of the fingers of the right hand, mild tremor-like shaking of the right arm when Plaintiff made a fist, reduced right shoulder abduction and forward elevation to 130/150 degrees, mild pain with ROM of the right knee, and 4/5 strength of the distal RUE. Tr. at 730–31. He wrote the following:

> The claimant appears to have very serious physical and mental health pathology. The challenge for the claimant is that her pathology is not visible on the surface but rather is internal. The CRPS and the mental challenges are real and significant and appear to be functionally limiting even for light duty type of activity.

Tr. at 731.

Plaintiff presented to David R. Kingery, M.D. ("Dr. Kingery"), for a surgical consultation on September 18, 2017. Tr. at 743. Dr. Kingery recorded positive medial McMurray maneuver, stable cruciate and collateral ligaments, no swelling, and ROM of zero to 130 degrees on exam of the right knee. Tr. at 746. He assessed an acute meniscus tear of the right knee and ordered arthroscopy with partial right medial meniscectomy. *Id.*

On September 20, 2017, state agency medical consultant Ronald Collins, M.D. ("Dr. Collins"), reviewed the record and assessed Plaintiff's physical RFC as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; frequently push/pull with the RUE; never crawl or climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and climb ramps and stairs; frequently reach overhead and finger with the RUE; and avoid concentrated exposure to extreme cold, extreme heat, vibration, and hazards. Tr. at 326–29. A second state agency medical consultant, Stephen Burge, M.D. ("Dr. Burge"), assessed a similar physical RFC, except that he did not restrict Plaintiff's exposure to extreme heat and vibration. *Compare* Tr. at 326–29, *with* Tr. at 347–51.

Dr. Kingery performed arthroscopy to treat a torn right medial meniscus on September 29, 2017. Tr. at 775–80.

Plaintiff presented to PA Rate for post-surgical follow up on October 10, 2017. Tr. at 749. She reported her pain was improving, but she continued to require pain medication, especially with weather changes. *Id.* PA Rate noted well-healed port holes, minimal swelling, and no other abnormalities. *Id.* She advised Plaintiff to continue to exercise on her own and to follow up with Dr. Kingery in a few weeks. *Id.*

On November 13, 2017, Plaintiff reported a lot of recent problems with her health. Tr. at 785. She stated she and her husband were fostering two teen girls. *Id.* She indicated her medication was helpful, but her anxiety was increased. *Id.* Dr. Boyd noted normal findings on MSE. *Id.* She continued Plaintiff's medications. *Id.*

Plaintiff followed up with Dr. Kingery on November 20, 2017. Tr. at 752. She reported improved symptoms. *Id.* Dr. Kingery noted a surgical pathology report showed chronic synovitis. *Id.* He stated Plaintiff had mild swelling of her right knee, but good ROM and stable cruciate and collateral ligaments. *Id.* He prescribed Prednisone 10 mg to resolve any remaining synovitis and instructed Plaintiff to return as needed. Tr. at 753.

Plaintiff presented to The Cleveland Clinic Foundation's Pain Management Center for evaluation of RUE pain on February 5, 2018. Tr. at 817. She described burning, cramping, and crushing pain shooting from her elbow to her middle finger like lightening and accompanied by numbness in

her elbow. *Id.* She reported intermittent swelling, redness and blotching of her skin, occasional bicep twitching, right hand tremor, and cold intolerance. *Id.* She stated her pain was worsened by any type of prolonged activity. *Id.* Jack Diep, M.D. ("Dr. Diep"), noted reduced grip strength, decreased abduction and adduction against resistance, numbness at the elbow, decreased sensation along the ulnar distribution, cool-to-touch right upper extremity, and point tenderness along the right shoulder, lateral arm, lateral and medial forearm, and hand. Tr. at 819. He stated Plaintiff had elements of CRPS and other differential diagnoses included right ulnar neuralgia and myofascial pain. *Id.* He ordered a right stellate ganglion block. *Id.*

Richard Rosenquist, M.D. ("Dr. Rosenquist"), administered a right stellate ganglion block on March 19, 2018. Tr. at 822–23.

On April 11, 2018, Plaintiff endorsed no relief from the right stellate ganglion block and reported increased pain she rated as a six-to-seven. Tr. at 811. She described her arm as feeling like it was in a vice and under pressure and noted "large muscle knots from spasm" that lasted for a couple of minutes at a time. *Id.* She indicated her pain was increased by cold weather and rain. *Id.* Rachel Diehl, M.D. ("Dr. Diehl"), noted obesity, 4/5 right upper extremity strength, reduced grip strength, decreased abduction and adduction against resistance, numbness at the elbow, decreased sensation along the ulnar distribution, cool-to-touch right upper extremity, and marked

tenderness to palpation over the right-sided scalene muscles of the neck and right shoulder, lateral arm, lateral and medial forearm, and hand. Tr. at 814. She recommended physical therapy to work on Plaintiff's posterior and middle scalene muscles and scheduled her to return in six weeks for posterior and middle scalene trigger-point injections. *Id.*

###### 3.    Vocational Report

Vocational Rehabilitation Counselor David R. Price ("Mr. Price"), interviewed Plaintiff, reviewed the record, and prepared a vocational assessment on March 22, 2017. Tr. 473–79, 629–35. He observed Plaintiff to be anxious and noted "consistent distraction and inability to concentrate and hold attention" as reflected on standardized testing. Tr. at 475, 631. He said scores were "valid for current status but most probably [were] not reliable." *Id.* He observed Plaintiff's right forearm to be slightly swollen and to change color during the assessment "from normal to red to purple and black to red." *Id.* He stated Plaintiff was sad and tearful at several points during the interview. *Id.*

Mr. Price noted Plaintiff had "very little use of her dominant upper extremity as any meaningful activity results in a severe and prolonged pain flare." Tr at 478, 634. He stated Plaintiff had shifted tasks to her left side, resulting in "slow and awkward use and increasing pain in the left arm from overuse." *Id.* He noted Plaintiff's preexisting conditions of anxiety and

depression had been exacerbated by her pain, physical limitation, altered lifestyle, and stress. *Id.* He indicated Plaintiff had returned to work following carpal tunnel release and ulnar nerve transposition, but was terminated because of problems with her work relationships and job performance. *Id.* He stated the restrictions Dr. Lee provided for "no lifting greater than five pounds and limited use of the right arm" remained in effect, as did Dr. Boyd's impression of "total disability." Tr. at 478–79, 634–35. He wrote the following:

> With severe ongoing pain, stringent physical limitations and major psychological disability [Plaintiff] is in no condition to attempt a return to work. Any effort would most probably end in failure. She is functioning in a less-than-sedentary capacity physically and psychologically is currently unable to maintain the complex relationships of the workplace.

Tr. at 479, 635. He further wrote:

> I would consider [Plaintiff] completely and totally disabled from the vocational perspective. I do not think that vocational rehabilitation is the answer. For [Plaintiff] to return to the workforce she will need better pain management, improved function of her right arm, and less reliance on pain medications that impair cognitive function. She will need stabilization of her psychological state with the ability to handle the stresses and relationships of the workplace that are necessary for success. Until such time [Plaintiff] will continue to be disabled. She has started the process of seeking social security disability retirement. I think this is an appropriate move and I support her efforts.

*Id.*

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

Plaintiff appeared without counsel at the hearing on October 30, 2018. Tr. at 44. She testified she lived in a home with her son. Tr. at 61. She noted her husband lived in the home part-time, as he was working in Tennessee. *Id.* She stated she had worked as a legal assistant and paralegal from 1999 until September 2016 in multiple law firms and for the state of South Carolina. Tr. at 63–75.

Plaintiff testified that CRPS was the most severe problem that affected her ability to work. Tr. at 77. She explained that it affected her right arm and had initially presented when she hit her arm on a doorknob in 2014. Tr. at 77–78. She confirmed that she had undergone carpal tunnel release and ulnar nerve surgeries to the RUE after seeing doctors and participating in physical therapy. Tr. at 78. She indicated she experienced persistent pain, swelling, and cold sensitivity. Tr. at 80. She stated she had no feeling on the underside of her elbow. Tr. at 81, 82. She said her upper elbow was sensitive to touch, cold, and certain fabrics. *Id.* She testified she had pain in her shoulder that was worsened by wearing a bra. *Id.* She indicated her symptoms had worsened since her surgery. Tr. at 82.

Plaintiff testified that she experienced cramping in her hand when she awoke each morning. Tr. at 84. She said her shoulder and elbow were typically sore, but improved once she showered. *Id.* She indicated she used an ergonomic keyboard and mouse and typically spent two hours at a time going over her budget. *Id.* She stated she experienced constant pain the following day that radiated from her hand up her forearm. *Id.* She said she had to hold her arm if she stood for an extended period because the weight of her arm caused her shoulder and neck to hurt. *Id.* She noted she experienced pain when doing dishes, moving papers, vacuuming, and lifting. Tr. at 84–85. She said her arm twitched involuntarily. Tr. at 87–88. She denied taking any medication for her arm on a regular basis. Tr. at 87.

Plaintiff testified she had visited Cleveland Clinic, where a nerve block proved ineffective. Tr. at 86. She said she had to fly to attend appointments at Cleveland Clinic and to visit family in Ohio because she had difficulty gripping a steering wheel. *Id.*

Plaintiff admitted she had injured her right knee when her dog walked in front of her around April 2017. Tr. at 88–89. She stated her knee improved somewhat, but she reinjured it when she subsequently fell from a bus during a trip to New York City. Tr. at 90–91. She noted an MRI showed a radial tear to the medial meniscus and degenerative changes to the medial and lateral compartments of her right knee. Tr. at 91. She indicated she subsequently

underwent right medial meniscus repair. *Id.* She stated her knee had slowly improved to allow her to climb stairs and walk up and down her street again. Tr. at 91–92. She said her knee continued to swell with prolonged standing and walking such that she could only stand and walk for about 15 minutes at a time. Tr. at 93–95. She indicated her back hurt when she was standing and walking because her gait was impaired. Tr. at 95.

Plaintiff testified she had been diagnosed with hemochromatosis. Tr. at 98. She stated she had been to the hospital twice for abnormal liver enzymes, acute hepatitis, and vomiting blood. Tr. at 98–99.

Plaintiff stated she had treated with Dr. Boyd since 2012. Tr. at 101. She said she had suffered from depression prior to initiating treatment with Dr. Boyd, who then diagnosed her with PTSD and ADHD. Tr. at 102. She stated she experienced anxiety and panic symptoms nearly every day. Tr. at 103. She described sweating, heart palpitations, and tearfulness that typically lasted for 15 to 20 minutes at a time. Tr. at 103, 104. She noted she had no control over her panic attacks and that they could be caused by anything. Tr. at 104. However, she admitted she was increasingly sensitive and feared that others were looking at her because of her weight gain. *Id.* She said she had taken one Xanax a day that had controlled her panic attacks before she injured her arm. Tr. at 105. She stated she started taking three Xanax a day after injuring her arm and continued to have panic attacks. *Id.*

She indicated she took Wellbutrin for depression and had done so for over 10 years. Tr. at 105–06. She stated she would cry if she failed to take Wellbutrin, but her symptoms were controlled if she took it. Tr. at 106. She noted she was taking the highest dose of Wellbutrin and had taken the same dose for years. Tr. at 106–07. She said Cymbalta made her feel like "a zombie" and Prozac caused her to gain weight. Tr. at 107. She indicated she continued to forget things and lose concentration, despite taking Adderall 60 mg. Tr. at 107–08. She said she had problems controlling her mood and described an incident in which she was in such pain that she was screaming in "a fit of rage." Tr. at 108–09. She stated she had nightmares three to four times a week, slept poorly, woke every two hours, and was sometimes up all night because of her pain. Tr. at 109–10.

Plaintiff testified she could perform personal care activities independently. Tr. at 110. She said it hurt to wash her hair, shower, dry herself, and put on pants. *Id.* She indicated she could feed her dogs and cats, but could not carry their water bowls because her hand would give out. Tr. at 111. She said she enjoyed vacuuming, but could only do a little at a time. Tr. at 111–12. She stated she liked to wash dishes by hand because the hot water felt good, but the constant motion caused the area by her wrist bone to swell. Tr. at 112. She explained that she typically performed household chores for two to three minutes at a time during commercial breaks. *Id.* She said she

was able to prepare meals once or twice a week. Tr. at 114. She indicated she was no longer able to pull weeds to maintain her flower garden. *Id.* She stated she was unable to drive for long distances because she could only grip the steering wheel with her left hand. Tr. at 114–15. However, she admitted she drove three-and-a-half hours to pick up her husband in Tennessee. Tr. at 115. She said she drove to the hearing without difficulty and typically drove by herself to doctors' visits. Tr. at 116. She indicated she had difficulty pushing a shopping cart and would typically pick up four small items at the store so that she did not require a cart. *Id.* She estimated she could lift 20 to 30 pounds with both arms. Tr. at 117.

   b.    Vocational Expert Testimony

Vocational Expert ("VE") William Wayne Stewart, Ph.D., reviewed the record and testified at the hearing. Tr. at 118–29. The VE categorized Plaintiff's PRW as a paralegal, *Dictionary of Occupational Titles* ("*DOT*") number 119.267-026, as requiring light exertion with a specific vocational preparation ("SVP") of 7. Tr. at 120. He noted Plaintiff performed some of her jobs at the sedentary exertional level. Tr. at 122. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform work at the light exertional level; frequently push, pull, reach, handle, finger, and feel with the right (dominant) upper extremity; never crawl or climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and

climb ramps and stairs; must avoid all exposure to extreme cold; could tolerate occasional exposure to wetness and hazards such as unprotected heights and moving machinery; and remained capable of simple, routine tasks consistent with a reasoning development level of two or less as defined in the *DOT*, in an environment free from production rate pace such as that of an assembly line, and that required no more than occasional changes in work setting or duties. Tr. at 122–23. The VE testified the hypothetical individual would be unable to perform Plaintiff's PRW. Tr. at 124. The ALJ asked whether there were any other jobs the hypothetical person could perform. *Id.* The VE identified jobs at the light exertional level with an SVP of 2 as an office helper, *DOT* number 239.567-010, a marker/tagger, *DOT* number 209.587-034, and a mail clerk, *DOT* number 209.687-026, with 165,000, 70,000, and 93,000 positions in the national economy, respectively. Tr. at 124–25.

The ALJ posed a second hypothetical question in which he asked the VE to consider an individual of Plaintiff's vocational profile who was restricted as described in the first question and would be off-task for 10 percent of the workday exclusive of any regularly-scheduled breaks. Tr. at 125. He asked if the individual would be able to perform the jobs the VE previously identified. Tr. at 126. The VE confirmed the individual would be able to perform the jobs. *Id.*

The ALJ posed a third hypothetical question in which he asked the VE to consider an individual of Plaintiff's vocational profile who was restricted as described in the first hypothetical question and would be off-task for 25 percent of the workday, exclusive of regularly scheduled breaks. *Id.* He asked if there would be any jobs available to the hypothetical individual. Tr. at 127. The VE testified there would be no jobs. *Id.*

The ALJ asked the VE if his testimony was consistent with the *DOT*. Tr. at 128. The VE confirmed that it was, except that the *DOT* did not address time off-task and limited use of a single extremity. Tr. at 128–29. He stated his testimony as to that information was based on his education, training, and clinical experience. Tr. at 129.

### 2. The ALJ's Findings

In his decision dated March 20, 2019, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2021.
2. The claimant has not engaged in substantial gainful activity since September 27, 2016, the alleged onset date (20 CFR 404.1571 *et seq.*).
3. The claimant has the following severe impairments: complex regional pain syndrome/reflex sympathetic dystrophy of the right upper extremity, status post right carpal tunnel release and ulnar nerve transposition; degenerative joint disease of the right knee, status post arthroscopy and partial medial meniscectomy; obesity; major depressive disorder; post-traumatic stress disorder; and adult attention-deficit hyperactivity disorder (20 CFR 404.1520(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except for the following limitations: no more than frequent pushing, pulling, reaching, handling, fingering, and feeling with the right, dominant, upper extremity; no crawling; no climbing of ladders, ropes, or scaffolds; no more than occasional balancing, stooping, kneeling, crouching, or climbing of ramps and stairs; avoidance of all exposure to extreme cold; no more than occasional exposure to wetness and hazards such as unprotected heights and moving machinery; only simple, routine tasks consistent with a reasoning development level of two or less as defined in the *Dictionary of Occupational Titles* in an environment free from production-rate pace, such as that of an assembly line, and that requires no more than occasional changes in work setting or duties; and an allowance to be off-task for 10% of the workday, exclusive of regularly scheduled breaks.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.  The claimant was born on March 30, 1973 and was 43 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from September 27, 2016, through the date of this decision (20 CFR 404.1520(g)).

Tr. at 19–35.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ did not properly weigh the medical opinions;

2)    the ALJ failed to adequately assess Plaintiff's subjective allegations;

3)    the ALJ erroneously found that Plaintiff could perform jobs requiring a general educational development ("GED") reasoning level of two; and

4)    the ALJ did not address third-party function reports from Plaintiff's family members.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4) whether such impairment prevents claimant from performing PRW;[4] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[4] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65

(4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

    2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is

rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

   B.   Analysis

      1.   Medical Opinions

Plaintiff claims the ALJ erred in affording little weight to the medical opinions of record, despite their consistencies. [ECF No. 11 at 8–13]. She maintains the ALJ provided insufficient reasons for giving "no more than partial evidentiary weight" to the state agency consultants' assessments of moderate limitations in all mental functional areas. *Id.* at 8. She contends the assessment of moderate limitations was supported by Dr. Boyd's treatment notes and opinion that Plaintiff's mental health symptoms were exacerbated by her injury and that she was unable to work beginning September 27, 2016. *Id.* She further maintains Mr. Price opined that her injury had exacerbated her mental health symptoms, requiring increased medication and causing interference with work relationships and job performance. *Id.* at 8–9. She noted Dr. Schleuter found that her challenges "appear[ed] to be functionally limiting even for light duty." *Id.* at 9. She indicated Dr. Lee restricted her to no pushing, pulling, or lifting over five pounds. *Id.* She claims the medical

opinions consistently supported a finding that she would be off task for an excessive portion of the workday. *Id.* She further maintains the evidence was consistent in that numerous providers observed her to have reduced grip strength, decreased ROM, and decreased sensation. *Id.* at 11. She contends the ALJ supplanted his own opinion as to her functioning for the opinions of the medical experts. [ECF No. 13 at 5].

The Commissioner argues Plaintiff is asking the court to reweigh the evidence because she failed to cite evidence to support a finding that any particular opinion was entitled to more weight than the ALJ gave it. [ECF No. 12 at 16]. He maintains the ALJ considered the evidence based on the regulations that were applicable on the date Plaintiff filed her claim. *Id.* at 17. He contends the ALJ supported his conclusions as to the state agency consultants' opinions, explaining that he could not accept the psychological consultants' assessment of moderate limitations because the medical evidence did not support such a degree of limitation. *Id.* at 13. He maintains the ALJ supported his assessment of mild, as opposed to moderate limitations based on the absence of limitations in remembering work locations or procedures, Plaintiff's sporadic treatment with Dr. Boyd, Dr. Boyd's treatment notes and opinion, Plaintiff's ADLs and self-reports, and the state agency consultants' findings that Plaintiff had no significant limitations in asking simple questions, requesting assistance, maintaining

socially-appropriate behavior, adhering to basic standards of neatness and cleanliness, traveling in unfamiliar places, using public transportation, and being aware of normal hazards and taking appropriate precautions. *Id.* at 13–16.

Because Plaintiff's applications for benefits were filed prior to March 27, 2017, the rules and regulations in 20 C.F.R. § 404.1527 and SSRs 96-2p, 96-5p, and 06-3p apply.[5] *See* 20 C.F.R. § 404.1520c (stating "[f]or claims filed before March 27, 2017, the rules in § 404.1527 apply"); *see also* 82 Fed. Reg. 15,263 (stating the rescissions of SSR 96-2p, 96-5p, and 06-3p were effective for "claims filed on or after March 27, 2017").

Medical opinions are "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [her] symptoms, diagnosis and prognosis, what [she] can still do despite impairment(s), and [her] physical or mental restrictions." SSR 96-5p (quoting 20 C.F.R. § 404.927(a)(2)). ALJs are required to "evaluate every medical opinion [they] receive." 20 C.F.R. § 404.1527(c).

---

[5] In her initial brief, Plaintiff claimed her application for benefits was filed on April 22, 2017, and that the rules in 20 C.F.R. § 404.1520c apply. *See* ECF No. 11 at 11. In fact, the record reflects that the claim was protectively filed on March 2, 2017, and completed on March 9, 2017, prior to the regulatory changes. *See* Tr. at 335, 409. Plaintiff admits her error in her reply brief and agrees that the rules in 20 C.F.R. § 404.1527 apply. [ECF No. 13 at 1].

If the record contains an opinion from a treating source who is an acceptable medical source pursuant to the regulations, the ALJ is required to accord controlling weight to that opinion if it is well supported by medically-acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence of record. 20 C.F.R. § 404.1527(c)(2). If the record contains no opinion from an acceptable treating medical source or if the ALJ declines to accord controlling weight to the acceptable treating medical source's opinion, he is required to weigh all the medical opinions of record based on the following factors: "(1) whether the physician examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson*, 434 F.3d at 654 (citing 20 C.F.R. § 404.1527(c)). The factors in 20 C.F.R. § 404.1527(c) "explicitly apply only to the evaluation of medical opinions from 'acceptable medical sources." SSR 06-3p, 2006 WL 2329939 at *4 (2006). Nevertheless, these factors represent basic principles for the consideration of all opinion evidence. *Id.*

a.    Opinion Evidence as to Mental Restrictions

State agency consultants Drs. Farish-Ferrer and Blase rated Plaintiff as moderately limited in her abilities to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and

adapt or manage oneself. Tr. at 323–24, 345–46. They provided mental RFC assessments indicating Plaintiff had moderate difficulties in her abilities to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted by them; interact appropriately with the general public; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting. Tr. at 329–31, 351–53. Dr. Blase also considered Plaintiff to be moderately limited in her abilities to accept instructions and respond appropriately to criticism from supervisors and to set realistic goals or make plans independently of others. Tr. at 352, 353.

The ALJ found Drs. Farish-Ferrer's and Blase's opinions were entitled to no more than partial evidentiary weight. Tr. at 31. He indicated "[t]he medical evidence of record simply d[id] not show th[e] degree of limitation they assessed. *Id.* He explained the evidence "provide[d] no indication that the claimant would miss work for mental health reasons or would have issues dealing with others." *Id.*

The ALJ assessed mild limitation in understanding, remembering, or applying information. Tr. at 22. He noted Drs. Farish-Ferrer and Blase assessed moderate limitation in the area, but "no significant limitation in

remembering locations and work-like procedures or understanding and remembering detailed instructions." *Id.* He considered the consistency of the assessed degree of limitation with the other evidence, explaining:

> Although the claimant has treated with Dr. Boyd for years, the frequency of the claimant's office visits is somewhat sporadic with no current evidence of follow-up since November 2017, nearly a year prior to the hearing on this matter. Dr. Boyd's treatment notes further show that the claimant is generally well maintained on medication alone without the need for emergent or inpatient care. During the period at issue, Dr. Boyd did increase the claimant's anxiety medication, but the claimant has otherwise been on substantially the same medicinal regimen for years (Exhibits 5F, 9F, and 16F). Furthermore, although Dr. Boyd has repeatedly indicated that the claimant's mental impairments preclude work (Exhibits 5F, pp. 25–27 and 11F), in a mental health questionnaire, Dr. Boyd reported, inconsistent with that conclusion, that the claimant has good ability for activities of daily living, adequate ability to relate to others, and adequate ability to complete simple, routine tasks (Exhibit 11F).

Tr. at 22–23. He referenced Plaintiff's ADLs as "indicative of strong retained ability" in the area of understanding, remembering, or applying information, citing her abilities to drive, perform household chores with breaks, tend to her personal care, work for years at a skilled job despite her mental impairments, prepare meals occasionally, shop in stores, care for her pets, manage her finances, occasionally attend sporting events, read, work puzzles, and undertake trips to Tennessee and New York City. Tr. at 23.

The ALJ also assessed mild limitation in interacting with others. *Id.* He considered Drs. Farish-Ferrer's and Blase's assessments of moderate difficulties in this area to conflict with their impressions that Plaintiff had no

significant limitations in asking simple questions, requesting assistance, maintaining socially appropriate behavior, and adhering to basic standards of neatness and cleanliness. *Id.* He again addressed Plaintiff's treatment history with Dr. Boyd, providing the same explanation he offered to support his assessment of mild limitation in understanding, remembering, or applying information. *Compare* Tr. at 22, *with* Tr. at 23. He wrote: "despite some difficulty, the record shows that the claimant can maintain healthy familial relationships, and she can engage the public by driving, taking trips, and shopping in stores (Exhibit 4E, 8E, and Testimony)." *Id.*

The ALJ assessed mild limitation in adapting or managing oneself. Tr. at 24. He acknowledged Drs. Farish-Ferrer's and Blase's assessment of moderate difficulties in this area, but considered their assessment as conflicting with their indications that Plaintiff had no significant limitation in being aware of normal hazards and taking appropriate precautions, traveling in unfamiliar places, and using public transportation. *Id.* He repeated his assessment of Dr. Boyd's treatment and opinion. *Compare* Tr. at 24, *with* Tr. at 22, 23. He noted Plaintiff "could competently testify regarding her educational and vocational history, which includes two years of college and several years in a skilled job" and completed ADLs "suggestive of strong retained ability in this area." *Id.*

Although the ALJ cited valid reasons for giving only partial weight to the state agency psychological consultants' opinions and for assessing mild impairment as to Plaintiff's abilities to understand, remember, and apply information, interact with others, and manage herself, he failed to reconcile his conclusions with multiple opinions throughout the record that supported greater limitations.

In addressing whether Drs. Farish-Ferrer and Blase's assessments of moderate limitations were consistent with the other evidence of record, the ALJ cited perceived inconsistencies with Plaintiff's treatment with Dr. Boyd and Dr. Boyd's treatment notes, but did not acknowledge consistency with her opinion as to Plaintiff's work-related limitations. *Compare* Tr. 329–31 and 351–53, *with* Tr. at 701.

Dr. Boyd wrote: "pt, due to severe anxiety, panic symptoms, depression, concentration difficulties and mood swings, is unable to currently fulfill her current job obligation" and further noted "[a]s of 8/14/15, her symptoms have exacerbated/worsened and she is unable to work due to the above diagnoses/symptoms." Tr. at 571. She subsequently assessed Plaintiff as having poor ability to complete complex tasks and noted "[h]er current ability to work is severely impacted by her depression at this time." Tr. at 701.

The ALJ accorded "little evidentiary weight" to Dr. Boyd's opinions. Tr. at 32. He wrote:

> [T]he routine office visit notes from Dr. Boyd tend to show far less difficulty stemming from the claimant's mental impairments than what Dr. Boyd has reported in worker's compensation forms, a mental questionnaire, and other such opinion statements. From Dr. Boyd's treatment notes, it is clear that the claimant's visits are sparse, and the claimant has never required inpatient or emergency treatment. Moreover, throughout the period at issue, the claimant has generally been well maintained on a stable medicinal regimen. For example, the claimant admitted during the hearing that she has been on the same dosage of Wellbutrin for several years, and that she does well on this medication. Additionally, the claimant has previously worked full-time, at a skilled position despite these mental impairments. The claimant also frequently indicates to Dr. Boyd that she is "okay" or "better" and the claimant's activities of daily living are essentially intact from a mental health standpoint. The medical evidence of record fails to show any more than mild limitation due to the claimant's mental impairments, although the undersigned will accept up to moderate limitation in terms of concentration, persistence, and pace.

Tr. at 30–31. He noted "the conclusion that the claimant cannot perform her current work duties is reserved to the Commissioner of Social Security." Tr. at 31. He stated "Dr. Boyd did not discuss any particular limitations or any specific evidence to support her conclusion." *Id.* He indicated the form Dr. Boyd used "was not consistent with the Agency's disability process or standards." Tr. at 31–32.

The ALJ addressed Dr. Boyd's completion of the mental health questionnaire, noting her "check box and mental status findings [were] consistent with her treatment notes and the overall medical evidence of record." Tr. at 32. However, he indicated Dr. Boyd "inconsistently concluded that the claimant's ability to work was severely impaired." *Id.* He noted Dr.

Boyd had not "offer[ed] specific limitations" and that her conclusion was one reserved to the Commissioner. *Id.* He gave some evidentiary weight to Dr. Boyd's mental status and check box findings, but "little evidentiary weight" to her conclusion as to Plaintiff's ability to work. *Id.*

The ALJ did not thoroughly consider support for Dr. Boyd's opinion in her treatment notes as required pursuant to 20 C.F.R. § 404.1527(c)(3). Plaintiff generally reported stable psychiatric symptoms, and Dr. Boyd often recorded normal findings on MSE prior to the surgery to her RUE. *See* Tr. at 597, 599, 600, 601. However, in August 2015, Plaintiff complained of irritability associated with pain in her arm, and Dr. Boyd increased Xanax 0.5 mg to twice a day, from once daily as needed. Tr. at 602. Plaintiff reported worsened anxiety on November 23, 2015, and Dr. Boyd increased Xanax 0.5 mg to three times a day. Tr. at 603. Plaintiff endorsed mood swings, depression, and pain-related sleep disturbance on February 22, 2016, and Dr. Boyd noted irritable mood and prescribed Cymbalta 30 mg. Tr. at 606. However, Dr. Boyd subsequently discontinued Cymbalta and prescribed Prozac on March 29, 2016, after Plaintiff reported side effects and continued to endorse mood swings, anxiety, and depression. Tr. at 607. Plaintiff reported a positive response to Prozac on May 11, 2016, and requested an increased dose. Tr. at 608. Dr. Boyd granted Plaintiff's request and increased Prozac to 40 mg. *Id.* Plaintiff reported being under significant stress on

August 9, 2016, but an MSE was normal and no changes were made to her medications. Tr. at 610. On September 27, 2016, Plaintiff reported she had been overwhelmed by her job and her employer had terminated her. Tr. at 612. Dr. Boyd observed anxious and sad mood/affect on MSE. *Id.* During a follow up visit on October 7, 2016, Dr. Boyd noted tearful mood/affect on MSE. Tr. at 613. On January 30, 2017, Plaintiff complained of a lot of pain, anxiety, and frustration, but did not request to change her medications. Tr. at 640. Plaintiff reported she "stay[ed] in bed a lot" and was "not good" on April 25, 2017. Tr. at 639. Dr. Boyd noted depressed mood/affect and increased Prozac to 60 mg. *Id.* Plaintiff reported stability on psychiatric medications and indicated she was "dealing with" pain related to RSDS/CRPS on August 29, 2017. Tr. at 786. On November 13, 2017, Plaintiff indicated her medication was helpful despite increased anxiety, and Dr. Boyd continued the same medication regimen. Tr. at 785.

The ALJ did not adequately consider the consistency of Dr. Boyd's opinions with the other evidence of record in accordance with 20 C.F.R. § 404.1527(c)(4). In addition to being somewhat consistent with the state agency consultants' opinions, as discussed above, Dr. Boyd's opinions were supported by Dr. Schmechel's notations that Plaintiff had decreased ability to concentrate during exams. *See* Tr. at 711, 721. The ALJ also failed to address consistency between Dr. Boyd's opinion and Dr. Schleuter's indication that

Plaintiff's "mental challenges [were] real and significant and appear[ed] to be functionally limiting even for light duty type of activity." Tr. at 731. Finally, he declined to consider that Dr. Boyd's opinion was supported by Mr. Price's observations that Plaintiff was anxious, demonstrated "consistent distraction and inability to concentrate and hold attention" as reflected on standardized testing, and was sad and tearful at several points during the interview. Tr. at 475, 631. In addition, Mr. Price similarly opined that Plaintiff was psychologically "unable to maintain the complex relationships of the workplace." *See* Tr. at 479, 635.

Because the ALJ failed to thoroughly address the supportability of Dr. Boyd's opinion with her treatment notes and to reconcile consistencies between the opinions as to the functional effects of Plaintiff's mental impairments, the undersigned finds he did not evaluate the opinion evidence in accordance with 20 C.F.R. § 404.1527(c).

### b.    Opinion Evidence as to Physical Restriction

Dr. Lee authorized Plaintiff to return to light duty work requiring no pushing, pulling, or lifting greater than five pounds and continued the restrictions following multiple treatment visits. Tr. at 559, 561, 564, 566, 568.

The ALJ allocated little weight to Dr. Lee's statements from March and April 2015, noting they were "temporary in nature," rendered soon after surgery on Plaintiff's right upper extremity, and predated the relevant

52

period. Tr. at 31. He acknowledged that between June and September 2015, Dr. Lee "issued a repeated limitation of no pushing or pulling and no lifting over five pounds." *Id.* However, he gave the statements "little evidentiary weight," finding they predated the period at issue and there was "no current evidence to suggest that th[e] limitations should carry over to the period at issue." *Id.*

The ALJ did not address whether Dr. Lee's opinion was supported by his own records or consistent with the other evidence of record in accordance with 20 C.F.R. § 404.1527(c)(3) and (4). While he was correct that the restriction predated Plaintiff's alleged onset date, the restrictions were imposed based on her complaints of RUE pain. The record reflects no improvement in Plaintiff's RUE pain since Dr. Lee imposed the restrictions. In addition, Dr. Schleuter's opinion is arguably consistent with it in that he considered RSDS/CRPS to be "functionally limiting even for light duty type of activity." *See* Tr. at 731. In the absence of further explanation, substantial evidence does not support the ALJ's conclusion as to Dr. Lee's opinion.

### 2.    Subjective Allegations

Plaintiff argues her statements as to the effects of her impairments were consistent with her medical records and the opinions of multiple medical experts and that the ALJ erred in declining to accept them. [ECF No.

11 at 18–20]. She maintains the ALJ cited only the evidence that supported his assessment and ignored all evidence to the contrary. *Id.* at 20.

The Commissioner argues the ALJ properly assessed Plaintiff's subjective complaints. [ECF No. 12 at 20]. He maintains the ALJ explained that Plaintiff's statements were not consistent with the medical evidence and discussed which of her alleged limitations were supported and which were not. *Id.* at 21.

In 2003, the Social Security Administration issued a policy interpretation ruling for evaluating cases involving RSDS/CRPS. The ruling explained that "RSDS/CRPS is a chronic pain syndrome most often resulting from trauma to a single extremity." SSR 03-2p, 2003 WL 22814447, at *1. Its "most common acute clinical manifestations include complaints of intense pain and findings indicative of autonomic dysfunction at the site of the precipitating trauma" and "may be associated with abnormalities in the affected region involving the skin, subcutaneous tissue, and bone." *Id.*

Pertinent to an ALJ's evaluation of a claimant's subjective allegations in cases involving RSDS/CRPS, the SSR provides:

> Given that a variety of symptoms can be associated with RSDS/CRPS, once the disorder has been established as a medically determinable impairment, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limit effects of pain or other

symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record. This includes the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record. Although symptoms alone cannot be the basis for finding a medically determinable impairment, once the existence of a medically determinable impairment has been established, an individual's symptoms and the effect(s) of those symptoms on the individual's ability to function must be considered both in determining impairment severity and in assessing the individual's residual functional capacity (RFC) as appropriate.

SSR 03-2p, 2003 WL 22814447 at *6.

The Fourth Circuit explained that, in all cases, "an ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms." *Lewis v. Berryhill*, 858 F.3d 858, 865–66 (4th Cir. 2017) (citing 20 C.F.R. § 404.1529(b), (c)). "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms." *Id.* at 866 (citing 20 C.F.R. § 404.1529(b)). The ALJ only proceeds to the second step if the claimant's impairments could reasonably produce the symptoms she alleges. *Id.* At the second step, the ALJ is required to "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit [her] ability to perform basic work activities." *Id.* (citing 20 C.F.R. § 404.1529(c)).

The ALJ must explain which of the claimant's symptoms he found "consistent or inconsistent with the evidence in [the] record and how [his] evaluation of the individual's symptoms led to [his] conclusions." SSR 16-3p, 2016 WL 1119029, at *8. "[I]n determining RFC, all of the individual's symptoms must be considered in deciding how such symptoms may affect functional capacities." SSR 03-2p, 2003 WL 22814447 at *7. Careful consideration must be given to the effects of pain and its treatment on an individual's capacity to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. *Id.* (citing SSR 96-7p (superseded by SSR 16-3p) and 96-8p). An ALJ is not to evaluate a claimant's symptoms "based solely on objective medical evidence unless that objective medical evidence supports a finding that the individual is disabled." *Lewis*, 858 F.3d at 866; *see also Arakas v. Commissioner, Social Security Administration*, 983 F.3d 83, 98 (4th Cir. 2020) ("We also reiterate the long-standing law in our circuit that disability claimants are entitled to rely exclusively on subjective evidence to prove the severity, persistence, and limiting effects of their symptoms.").

The ALJ found that "the medical evidence of record sufficiently established that the claimant experiences CRPS/RSD as described in SSR 03-02p" and that Plaintiff's medically-determinable impairments could reasonably be expected to cause the symptoms she alleged, but that her

statements concerning the intensity, persistence, and limiting effect of her symptoms were not entirely consistent with the evidence. Tr. at 29, 30. He indicated Plaintiff's allegations were "only partially supported by and consistent with the medical evidence of record" and were "further eroded by a number of factors that indicate that the claimant's conditions did not rise to the level of severity that was alleged." Tr. at 30. He addressed Plaintiff's CRPS/RSDS as follows:

> Over time, the physical examinations suggest some reduced strength and occasionally—some reduced sensation at this extremity, but the record fails to show other significant and sustained residual effects. Moreover, the claimant does not rely on any powerful medications for this condition, and physical examinations are otherwise grossly normal, for example, the physical examination reported by Dr. Schleuter. As such, the undersigned finds that the claimant would be limited in lifting, carrying, pushing, pulling, handling, fingering, and feeling with the right upper extremity; yet, there is insufficient evidence to suggest that the claimant's CRPS is disabling. The undersigned has also found limitation on exposure to extreme cold and other environmental limitations to accommodate this condition.

*Id.*

In summarizing the record, the ALJ noted Dr. Floyd's observations of "decreased reflexes at the right upper extremity, along with hyperesthesia, dysesthesia, hyperpigmentation, hypopigmentation, 5/5 strength, and normal bulk and tone." Tr. at 27. He stated Dr. Shissias observed mild contracture at the right hand and some coolness at the right upper extremity, but good hand strength despite some discomfort upon gripping. *Id.* He indicated Dr.

Schleuter observed decreased ROM of the right shoulder, but no wasting and otherwise normal ROM. Tr. at 29. He further cited Dr. Schleuter's reports that Plaintiff was in no acute distress, walked normally, had no skin changes or deformities at the right upper extremity, had normal ROM at the fingers and hands, had mild dexterity loss on the right upper extremity, had a mild tremor at the right upper extremity, had intact strength except for a mild deficit at the right upper extremity at 4/5, and had no atrophy or sensory deficits with intact reflexes. *Id.*

The Fourth Circuit recently noted the following as to evaluations of pain: "Since the 1980s, we have consistently held that 'while there must be objective medical evidence of some condition that could reasonably produce the pain, there need not be objective evidence of the pain itself or its intensity.'" *Arakas*, 983 F.3d at 95 (quoting *Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir. 1989); citing *Craig v. Chater*, 76 F.3d 585, 592–93 (4th Cir. 1996); *Hines v. Barnhart*, 453 F.3d 559, 563–65 (4th Cir. 2006)). The ALJ concluded that Plaintiff's medically-determinable impairments could reasonably be expected to cause the symptoms she alleged, thus satisfying the first step, but did not apply the correct legal standard in discrediting Plaintiff's complaints "based on the lack of objective evidence corroborating them." *See Arakas*, 983 F.3d at 96. Like the ALJ in *Arakas*, he "'improperly increased her burden of proof' by effectively requiring her subjective descriptions of her symptoms to

be supported by objective medical evidence." *Id.* (quoting *Lewis*, 858 F.3d at 866).

The ALJ erred in rejecting Plaintiff's allegations as to the disabling effects of her pain based primarily on exam findings that were not pertinent to her diagnosis. The SSA recognizes that RSDS/CRPS is an impairment primarily characterized by pain. SSR 03-2p, 2003 WL 22814447 at *1. It further provides that it "may be associated with abnormalities . . . involving the skin, subcutaneous tissue, and bone." *Id.* The SSR suggests the relevant evidence was that of changes to the pigmentation of Plaintiff's skin, abnormal temperature of her upper extremity, and tremor, as they were indicative of autonomic instability and involuntary movements. *See id.* at *4 (providing that signs of RSDS/CRPS include swelling, autonomic instability (changes in skin color or texture, changes in sweating, changes in skin temperature, and abnormal pilomotor erection (gooseflesh)), abnormal hair or nail growth, osteoporosis, or involuntary movements of the affected region). The ALJ cited some of these changes, but did not appear to give them due credit, instead focusing on other clinical signs that were not relevant to evaluation of the effects of RSDS/CRPS. He also noted that Dr. Schleuter documented an absence of skin changes, Tr. at 29. However, "[i]t should be noted that conflicting evidence in the medical record is not unusual in cases of RSDS

due to the transitory nature of its objective findings." SSR 03-2p, 2003 WL 22814447 at *5.

The ALJ's analysis does not show that he considered Plaintiff's allegations of disabling pain based on the entire record, as required by SSRs 03-2p and 16-3p. Pursuant to SSR 03-2p, 2003 WL 22814447 at *7, the ALJ should consider statements from rehabilitation counselors about the effects of the impairment on the individual's functioning in the workplace and from treating physicians and other practitioners with knowledge of the individual in assessing her ability to function on a day-to-day basis. Despite this instruction, the ALJ did not evaluate whether the information and statements provided by the treating and examining physicians and the vocational rehabilitation counselor supported Plaintiff's allegations as to the effects of her symptoms. Mr. Price observed Plaintiff's right forearm to be slightly swollen and to change color during the assessment "from normal to red to purple and black to red." Tr. at 475, 631. Dr. Shissias noted comparative coolness to touch of the RUE and visible discomfort to touch, even when Plaintiff was distracted. Tr. at 623. He felt contracture of Plaintiff's right fifth digit was most likely disuse atrophy due to RSDS. Tr. at 624. Drs. Diep and Diehl also noted the RUE was cool to touch. Tr. at 814, 819.

The ALJ further failed to consider whether Plaintiff's complaints and descriptions of her symptoms were consistent throughout the record. Plaintiff appears to describe symptoms related to RSDS/CRPS in much the same way to different providers. *See* Tr. at 572, 575, 623, 811, 817. In addition, the record reflects her complaints of chronic pain during most treatment visits following surgery to her RUE. *See* Tr. at 478, 560, 565, 567, 572, 575, 583, 602, 607, 613, 621, 623, 634, 640, 708, 718, 728, 786, 811, 817.

Substantial evidence does not support the ALJ's evaluation of Plaintiff's subjective symptoms given his failure to consider her allegations in light of the entire record and his overemphasis on objective evidence in a case involving an impairment primarily characterized by pain.

### 3.    Alleged Conflict Between VE's Testimony and *DOT*

Plaintiff argues the ALJ erred in finding she could perform jobs with a GED reasoning level of two given a restriction to simple, routine tasks. [ECF No. 11 at 13–17].

The Commissioner maintains substantial evidence supports the ALJ's conclusion that Plaintiff could perform a significant number of jobs in the economy. [ECF No. 12 at 17]. He argues the RFC specifically provided for performance of jobs with a GED reasoning level of two. *Id.* at 18–19.

In *Pearson v. Colvin*, 810 F.3d 204, 208 (4th Cir. 2015), the court noted that SSR 00-4p "require[s] the *ALJ* (not the vocational expert) to '[i]dentify

and obtain a reasonable explanation' for conflicts between the vocational expert's testimony and the *Dictionary*, and to '[e]xplain in the determination or decision how any conflict that has been identified was resolved.'" (emphasis in original). The court held that an expert's testimony that apparently conflicts with the *Dictionary* can only provide substantial evidence if the ALJ has received this explanation from the expert and determined that the explanation is reasonable and provides a basis for relying on the testimony rather than the *DOT*. *Id.* at 209–10.

The parties' arguments center on whether the ALJ erred in failing to resolve an apparent conflict between the VE's identification of jobs described in the *DOT* has having a reasoning level of two given the restriction in the RFC assessment for "only simple, routine tasks consistent with a reasoning development level of two or less as defined in the *Dictionary of Occupational Titles*," Tr. at 25. Jobs with a reasoning level of two require workers to "[d]eal with problems involving a few concrete variables in or from standardized situations." *DOT*, 1991 WL 688702 (2016). In *Lawrence v. Saul*, 941 F.3d 140, 143 (4th Cir. 2019), the court found a restriction to "simple, routine repetitive tasks of unskilled work" was not inconsistent with "Level 2's notions of 'detailed but uninvolved . . . instructions' and tasks with 'a few [ ] variables.'" It distinguished the RFC at issue from that in *Thomas v. Berryhill*, 916 F.3d 307 (4th Cir. 2019), noting: "the key difference is that Thomas was limited to

'short' instructions. 'Short is inconsistent with 'detailed' because detail and length are highly correlated. Generally, the longer the instructions, the more detail they can include." *Id.*

Here, the ALJ restricted Plaintiff to "simple, routine tasks," but did not restrict her to short tasks or instructions. Given the Fourth Circuit's explanation in *Lawrence*, the undersigned discerns no apparent conflict between the provision in the RFC assessment for "simple, routine tasks" and the ALJ's reliance on the VE's identification of jobs with a GED reasoning level of two.

Further supporting such a conclusion is the provision in the RFC assessment that tasks be "consistent with a reasoning development level of two or less." *See* Tr. at 25. Thus, the ALJ specifically found that Plaintiff had the RFC to perform jobs with a GED reasoning level of two. He relied on the VE's testimony to find that Plaintiff could perform jobs as an office helper and marker. Tr. at 34. A review of *DOT*'s descriptions of these jobs reveals they both had GED reasoning levels of two. *See* 239.567-010, OFFICE HELPER. *DOT* (4th Ed., Rev. 1991). 1991 WL 672232; 209.587-034, MARKER. *DOT* (4th Ed., Rev. 1991). 1991 WL 671802. Given the foregoing, there was no apparent conflict between the jobs the VE identified in response to the ALJ's RFC assessment and the *DOT*'s descriptions of those jobs.

Nevertheless, the ALJ's conclusion is not supported at step five because he did not adequately consider the medical opinion evidence and Plaintiff's subjective allegations in determining her RFC.

### 4.    Failure to Address Third-Party Function Reports

Plaintiff submitted additional evidence to the Appeals Council that included unsigned, undated, typed statements from her husband, son, and daughter. Tr. at 305–12.

Plaintiff argues the ALJ erred in failing to address third-party function reports from three of her family members that described her impairments and restrictions. [ECF No. 11 at 17–18].

The Commissioner claims the ALJ had no opportunity to review the third-party function reports because Plaintiff submitted them to the Appeals Council following the ALJ's decision. [ECF No. 12 at 20].

The ALJ did not err in declining to discuss this evidence in the decision because it did not appear in the record before him. However, this evidence, along with the additional medical evidence submitted to the Appeals Council, should be considered in accordance with SSR 03-2p on remand.

## III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the

Commissioner's decision is supported by substantial evidence. Therefore, the undersigned reverses and remands this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

February 27, 2021
Columbia, South Carolina

Shiva V. Hodges
United States Magistrate Judge